| | |
|---|---|
| THE GRANDOE CORPORATION, | Case No. 11-CV-0947 (PJS/FLN) |
| Plaintiff, | |
| v. | ORDER |
| GANDER MOUNTAIN COMPANY, | |
| Defendant. | |

Lisa Lamm Bachman and Peter A. T. Carlson, FAFINSKI MARK & JOHNSON, P.A., for plaintiff.

Dudley W. Von Holt and Paul M. Brown, THOMPSON COBURN LLP; John Edward Connelly, FAEGRE BAKER DANIELS LLP, for defendant.

This lawsuit arises out of a broken promise. Gander Mountain Company ("Gander Mountain"), a retailer of outdoor sporting goods, promised to buy approximately $3.05 million worth of gloves from the Grandoe Corporation ("Grandoe"), a manufacturer of gloves and other apparel. In reliance on this promise, Grandoe purchased the necessary raw materials and manufactured the gloves. After ordering and paying for approximately $950,000 worth of the gloves, however, Gander Mountain refused to issue any further purchase orders, denied that it had any legal obligation to pay for the rest of the gloves, and left Grandoe with a warehouse full of gloves that Grandoe cannot sell because they bear Gander Mountain's trademarks.

After unsuccessfully attempting to persuade Gander Mountain to honor its promise, Grandoe filed this lawsuit. The Court granted in part and denied in part Gander Mountain's motion for summary judgment. ECF No. 40. Grandoe's claims for breach of contract and promissory estoppel were tried to a jury. The Court asked the jury to make findings on both claims but explained that, in the event that the jury awarded Grandoe damages on both claims,

Grandoe would not receive a double recovery, but would instead recover only on the contract claim.

The jury found in Grandoe's favor on both claims. It awarded the identical amount — $1,557,284.40 — on each claim, and the Court entered judgment on Grandoe's behalf in the amount of $1,557,284.40. ECF Nos. 81, 83. This figure represents the contract price for Grandoe's remaining inventory of Gander Mountain-branded gloves.[1] *See* Minn. Stat. § 336.2-709(1)(b) (seller may recover price of goods identified to the contract if the seller is unable to resell them after reasonable effort). Grandoe should also have recovered incidental damages, *see* Minn. Stat. § 336.2-710, but the Court precluded Grandoe from introducing evidence of such damages at trial, because Grandoe's attorneys had inexplicably failed to disclose that evidence during discovery. This mistake appears to have cost Grandoe over $600,000.

This matter is now before the Court on the parties' post-trial motions. Gander Mountain moves for judgment as a matter of law on Grandoe's breach-of-contract and promissory-estoppel claims, and alternatively moves for a new trial. Grandoe moves to alter or amend the judgment to include pre- and post-judgment interest, and also asks the Court to order Gander Mountain to increase its letter of credit in Grandoe's favor for the purpose of staying execution of the judgment.

---

[1]Although the original contract price would suggest that Grandoe has over $2 million worth of leftover gloves, Grandoe was able to stop production on some gloves and re-brand and re-sell others. Grandoe also experienced some raw-material shortages, which caused it to manufacture fewer gloves than it had originally planned.

For the reasons stated below, the Court denies Gander Mountain's motion and grants Grandoe's motion in part. The Court awards Grandoe prejudgment interest in the amount of $572,389.20, for a total judgment of $2,129,673.60. Grandoe is also entitled to recover post-judgment interest at an annual compound rate of .15 percent. Finally, the Court orders Gander Mountain to increase its letter of credit to $2.15 million.

## I. BACKGROUND

Viewing the evidence in the light most favorable to Grandoe and drawing all reasonable inferences in Grandoe's favor, a jury could find the following facts:

### A. Grandoe and Glove Manufacturing

Grandoe is a small, family-run glove manufacturer that has been in business for over 100 years. Grandoe manufactures gloves under its own brand and under private-label programs for major retailers such as Dillard's, L.L.Bean, Nordstrom, REI, and Eddie Bauer. Grandoe had sold Grandoe-branded gloves to Gander Mountain before the events that gave rise to this lawsuit.

The manufacture of gloves is a surprisingly complex process. A high-performance glove consists of multiple components, including an outer shell, inner layers of insulation and padding, waterproof inserts, a palm grip, straps, clips, buckles, tags, logos, and wristlets. These components are made from an array of raw materials, some of which must be processed and manufactured into component parts by subcontractors before being shipped to the Grandoe factory.

Manufacturing a private-label glove — that is, a glove sold under the retailer's brand rather than the manufacturer's brand — is an even more complex process. The manufacturer and retailer must work closely together to determine how the retailer's logo will appear on both the

product and the packaging. There may be branding on multiple components, including tags, clips, and straps, as well as on the main body of the glove. The retailer may also want a custom-designed product so that its private-label products are clearly distinguishable from the manufacturer's own branded merchandise. Significantly for purposes of this case, the branding of the retailer's logos on a glove occurs fairly early in the manufacturing process, after the material is cut but before the glove is fully assembled.

It is the custom and practice of the apparel-manufacturing industry for a manufacturer to begin production after getting a verbal commitment from a buyer. Both the buyer and the seller treat these verbal commitments as binding. Some weeks or months after making the verbal commitment, the buyer will issue purchase orders to provide final shipping and payment details. Grandoe's previous transactions with Gander Mountain followed the industry practice: Gander Mountain made a verbal commitment, Grandoe manufactured the products based on the verbal commitment, and Gander Mountain followed up with purchase orders that were consistent with the verbal commitment. Gander Mountain did not issue the purchase orders until shortly before the shipping dates. Given the length of time normally necessary to manufacture gloves, Gander Mountain must have known, at the time it issued the purchase orders, that the gloves that it was ordering had already been manufactured in reliance on Gander Mountain's verbal commitments.

*B. The Glove Contract*

In the fall of 2008, Grandoe and Gander Mountain discussed a possible purchase of Grandoe-branded gloves for the fall 2009 season. Jeff Lee, who was Grandoe's vice president of sales, met with Jeanne Hall, who was Gander Mountain's product manager for its accessories department (which included cold-weather accessories such as gloves).

Sometime in late September or early October 2008, Lee and Hall met and discussed what the parties call an "early-season production program" of Grandoe-branded gloves. "Early-season production" (or "early production") means that Grandoe would manufacture the gloves during its slow season, which is normally between October and March. Because the program would make use of Grandoe's excess manufacturing capacity, Grandoe would offer a substantial discount on the wholesale price. To take advantage of this program, however, Gander Mountain had to commit in time for Grandoe to start production during its slow season.

At their meeting, Lee and Hall discussed quantities, styles, and other details. On October 28, Lee sent Hall an email with an attached spreadsheet itemizing the gloves to be manufactured. Pl.'s Ex. 1 at GC00004. At that point, Lee believed that he had a commitment from Gander Mountain to buy Grandoe-branded gloves, and Lee was seeking to nail down the details. Lee's email emphasized that "[t]iming is critical" because the early-production season was imminent. Pl.'s Ex. 1 at GC00004.

Hall emailed Lee in response, telling him that Gander Mountain had decided that all of its cold-weather accessories for the fall 2009 season would be marketed under Gander Mountain's own brand. Pl.'s Ex. 1 at GC00003. As Lee described it, this would mean that the product, packaging, header cards, and hang tags would all be branded with Gander Mountain logos. Lee told Hall that Grandoe could make the change — and, in fact, Grandoe had a great deal of expertise in producing private-label goods. Pl.'s Ex. 1 at GC00002. But, Lee told Hall, in order to take on the additional difficulties inherent in a private-label program, Grandoe would want Gander Mountain to commit to an in-line production program — that is, a manufacturing run at

regular prices during Grandoe's peak April through October season — in addition to the discounted, early-production program.

Because this was such a significant opportunity for Grandoe, both Lee and Eric Friedman, Grandoe's president and CEO, flew to Minnesota to meet with Hall on November 13. Also at that meeting was Bruce Marsh, an independent sales representative who was helping Grandoe negotiate with Gander Mountain. Marsh was an experienced sales representative who had worked with Grandoe for a number of years in transactions with other retailers. Marsh had also represented other manufacturers in their dealings with Gander Mountain, and thus Hall was quite familiar with him.

At the November 13 meeting, Lee and Friedman talked up Grandoe's private-label expertise and showed Hall samples of gloves, fabric swatches, and colors. The parties then engaged in detailed discussions about different styles, materials, and customization options. The parties agree that the meeting was productive and that Hall was quite enthusiastic about what she saw. Hall was also very attracted to the idea of the early-production program and the discount that Gander Mountain would enjoy. Lee and Friedman made it clear, however, that Grandoe's ability to offer a discount in connection with the early-production program was contingent on Gander Mountain also agreeing to purchase gloves at regular prices through the in-line program.

As noted, Hall was familiar with Marsh, who had worked with Gander Mountain before. Hall consulted Marsh about the quantity of each style of gloves that he thought Gander Mountain could sell. The parties agreed on bulk quantities for each style and also discussed wholesale and retail pricing and shipment dates. (All of the quantities came from Hall after she consulted with Marsh.) Hall also gave Lee and Friedman a copy of Gander Mountain's "Resource Allowance

Contract" ("RAC").  *See* Def. Ex. 2.  The RAC did not obligate Gander Mountain to buy or

Grandoe to sell any gloves, but it specified some of the ancillary terms (such as payment methods

and delivery terms) that would apply if Gander Mountain and Grandoe were to reach any sales

agreements during the coming year.

The parties had not originally planned a second meeting, but Hall was so pleased with

their progress that she asked Lee and Friedman to break out numbers for each style by size and

color for her to review and approve the next day.  She also wanted to finalize the RAC.  Back at

their hotel, Lee and Friedman worked late into the evening putting together a spreadsheet for the

early-production program with Hall's numbers (as well as two suggested junior styles that they

had not discussed with Hall at the meeting).  Lee emailed the early-production spreadsheet to

Hall that night, explaining that the spreadsheet "addresses all styles we are going to build for you

under the 'Early Season Production' umbrella."  Pl.'s Ex. 2.

The next day, Lee and Friedman reviewed the early-production spreadsheet line by line

with Hall, who approved each line with a phrase such as "that's good," "looks great," or "that's

fine."  They also reviewed delivery dates.  Hall promised to send purchase orders right away and

asked for weekly conference calls to keep her updated on Grandoe's progress in manufacturing

the gloves described on the early-production spreadsheet.

In addition to going over the early-production spreadsheet, the parties also discussed in-

store display details, and the parties signed the RAC.  Under the heading "Est. Receipts" on the

RAC, the parties wrote "$1.5M."  Def.'s Ex. 2.  Hall and her supervisor, Rick McCabe, both

testified that this estimate was essentially a nonbinding "talking point" and did not represent a

floor or ceiling on the amount of product that Gander Mountain would buy from Grandoe.

From her meetings with Lee and Friedman, Hall understood that Grandoe would immediately begin to manufacture the Gander Mountain-branded gloves that were encompassed by the early-production program. Despite this knowledge, Hall never told Lee or Friedman that she needed time to get approval from anyone else at Gander Mountain or that she could not make a commitment in time to take advantage of Grandoe's early-production program. Nor did Hall explain that Gander Mountain would not consider itself committed to purchase anything until it issued purchase orders. To the contrary, as noted, Hall was enthusiastic about the deal, gave line-by-line approval to the early-production spreadsheet, promised to send purchase orders right away, and asked for weekly conference calls to keep her up to date on Grandoe's progress in manufacturing Gander Mountain's private-label gloves.

### C. Grandoe Manufactures the Gloves

After returning to New York, Lee and Friedman immediately swung into action. *See* Pl.'s Ex. 3 (internal November 17 Grandoe email giving detailed instructions on getting the early-production program started). The early-production season was already upon them, and there was a lot of work to do if Gander Mountain's private-label gloves were to be manufactured and delivered on time. Toward that end, Grandoe assigned an employee to be the liaison for the Gander Mountain contract. As Friedman testified, a big private-label program has a lot of moving parts and requires careful coordination.

Over the next few months, the parties communicated frequently and in detail about the progress of the early-production and in-line programs.[2] A week after the November 14 meeting,

_____

[2] *See, e.g.*, Pl.'s Ex. 4 (November 17 email to Hall stating that Grandoe had assembled an internal management team to implement and manage the deal "from order date all the way to

(continued...)

Grandoe informed Hall that it had purchased material, secured production space, and scheduled production for the early-production program. Pl.'s Ex. 6 at GC00020. On December 2, Lee emailed a detailed spreadsheet of the in-line program to Hall, Pl.'s Ex. 9, and Hall approved all of the styles and quantities for the in-line program in a conference call. (The in-line styles differed from the early-production styles.) Grandoe also periodically sent prototype gloves to Hall for approval. Hall approved the logo choice and placement, Pl.'s Ex. 17, and also instructed Grandoe about how to gain access to Gander Mountain logos from an outside vendor.

Throughout this time, Lee repeatedly reminded Hall that Grandoe was waiting for the purchase orders, which Hall had promised to send promptly. Hall was inconsistent about maintaining the weekly conference-call schedule and responding to emails, which caused Lee some frustration. *See, e.g.*, Pl.'s Ex. 12. In January 2009, Hall and Lee agreed to meet at an outdoor-retailer trade show to discuss further details. *See* Pl.'s Ex. 14. During the meeting, Lee had the spreadsheets for both the in-line and early-production programs in folders. At one point during the meeting, Hall leaned forward and, gesturing at the folders, said, "Let me put your mind at ease. We're committed."

To generate purchase orders, Gander Mountain's system required the completion of "item set-up forms." These forms contain detailed information about the product, including quantities,

---

[2](...continued)
delivery"); Pl.'s Ex. 5 (November 18 email to Hall stating, among other things, that Grandoe had ordered various materials for the early-production program and needed a contact from Gander Mountain to handle logo design and packaging decisions); Pl.'s Ex. 6 (November 21 email to Hall with two-page list of items for her to review in advance of upcoming conference call); Pl.'s Ex. 12 (December 23 email to Hall stating that Grandoe had ordered all of the materials for the in-line program); Pl.'s Ex. 17 (February 9 email from Hall approving the Gander Mountain logos); Pl.'s Ex. 25 (April 6 email to Hall stating that packaging headers and hangtags are "all in motion" and that Grandoe would be ready to ship the first set of orders soon).

product descriptions, UPCs, and prices. In early February — just days after assuring Lee that Gander Mountain was "committed" to purchase the gloves identified on the spreadsheets — Hall asked Marsh (Grandoe's independent sales representative) to complete the item set-up forms for the glove orders. Hall emailed Marsh about the forms, stating that "we need the units for each sku to reflect our total unit forecast that we committed to." Pl.'s Ex. 18. Hall specifically asked Marsh to break out case-pack information — that is, information about how the gloves are packed for shipping purposes. Marsh completed and returned the forms to Hall, using the quantities from the spreadsheets that the parties had originally discussed back in November and to which Hall had reaffirmed her commitment in January.[3] Pl.'s Ex. 19. Hall never told Marsh or anyone else that the quantities on the forms were incorrect.

As of April 1, the glove production was essentially complete. On April 15, Hall told Lee that purchase orders had been generated, but that some styles had been cut "due to receipt cuts on our end." Pl.'s Ex. 27 at GC00056. Lee immediately became very concerned, asking which styles were cut and stating, "Jeanne — we already made these goods and they're under your brand." *Id.* In a later email, Lee explained that the entire early-production program was complete and that the in-line production was essentially complete. *Id.* at GC00055.

Starting in June 2009, Gander Mountain issued a series of purchase orders for a total of about $950,000 worth of gloves, Pl.'s Exs. 88, 97, but Gander Mountain then refused to issue any

---

[3]The record indicates that April Hart, a Grandoe project manager, completed item set-up forms for the in-line program back in December. Pl.'s Ex. 7. Whether Marsh completed forms only for the early-production program, or whether instead there was some reason that the in-line forms needed to be redone in February, is not clear from the record.

further purchase orders.  As noted, Gander Mountain's refusal has left Grandoe stuck with about $1.5 million worth of Gander Mountain-branded gloves in its warehouse.

## II.  MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Standard of Review

Judgment as a matter of law is warranted when a party has been fully heard on an issue and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ."  Fed. R. Civ. P. 50(a)(1).  In considering a motion for judgment as a matter of law, the court must view the facts in a light most favorable to the nonmoving party and grant the nonmoving party the benefit of all reasonable inferences.  *See Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.*, 439 F.3d 894, 899-900 (8th Cir. 2006).  The court should not grant the motion unless the evidence is susceptible of no reasonable inference sustaining the position of the nonmoving party.  *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 863 (8th Cir. 2004).

### B.  Contract

Gander Mountain argues that it is entitled to judgment as a matter of law on Grandoe's contract claim for the following reasons: (1) the parol-evidence rule bars consideration of the parties' oral agreement; (2) setting aside the parol-evidence rule, the terms of the parties' contract demonstrate that Gander Mountain had no obligation to purchase more gloves than it did; (3) the parties did not intend their agreement to be binding until Gander Mountain issued purchase orders; and (4) there was insufficient evidence of either offer or acceptance.  The Court considers each argument in turn.

### 1. Parol-Evidence Rule

Gander Mountain contends that the parties had an integrated written contract consisting of Gander Mountain's vendor manual, the purchase orders that Gander Mountain issued, and various other documents. Under the parol-evidence rule, Gander Mountain argues, this integrated written contract precludes evidence of the parties' contrary oral agreement.

Gander Mountain's vendor manual (formally named the "General Terms and Conditions of Purchase (Vendor Buying Agreement)") is available on the vendor section of Gander Mountain's website. *See* Def.'s Ex. 1. In May 2007, about a year and a half before the parties began negotiating the private-label program at issue in this case, Gander Mountain sent an email to Grandoe and other vendors instructing them to review the vendor manual because, as far as Gander Mountain was concerned, its terms would be incorporated in all future purchase orders. Def.'s Ex. 10.

The vendor manual asserts that every purchase order will be subject to the terms of the vendor manual and that the purchase orders and vendor manual (together with certain other documents) will constitute an integrated contract that cannot be amended except in writing. Def. Ex. 1 §§ 1.1-1.2, 13.7. The vendor manual also states that, by accepting a purchase order, the vendor agrees to be bound by the vendor manual, and that Gander Mountain rejects any different or additional terms proposed by the vendor. *Id.* § 1.4. Finally, the vendor manual states that Gander Mountain's forecasts, commitments, projections, and estimates are not binding on Gander Mountain until Gander Mountain agrees to them in writing and they become the basis of a purchase order. *Id.* § 2.1.

There are two problems with Gander Mountain's argument that the vendor manual is part of an integrated written contract that, under the parol-evidence rule, precludes evidence of the parties' oral agreement.  First, this argument is not properly before the Court because Gander Mountain never made it at any time before judgment — not at summary judgment, not in its motions in limine, and not in its pre-verdict Rule 50(a) motion.[4]  Second, even if Gander Mountain had preserved this argument, the Court would reject it on the merits because whether Grandoe agreed to enter into an integrated written contract that superseded the previous oral agreement was a question of fact for the jury.

### a. Procedural Bar

Gander Mountain is an aggressive and slippery litigant, and the arguments that it has made in this case have continually shifted.  At summary judgment, Gander Mountain relied heavily on its vendor manual and argued that, by posting its vendor manual on the Internet and inviting its vendors to read it, Gander Mountain gave notice to Grandoe (and the rest of its vendors) that Gander Mountain only intended to be bound by written purchase orders.  *See* ECF

---

[4]Grandoe noted that this argument is "belated," ECF No. 110 at 2, by which Grandoe may or may not have meant to argue that it was procedurally improper.  In any event, a court may address sua sponte whether a party has forfeited an argument.  *Cf. Plascencia v. Taylor*, No. 11-4197, 2013 WL 1200284, at *7 (10th Cir. Mar. 26, 2013) (despite plaintiff's failure to raise the issue, court could determine sua sponte whether defendant waived sufficiency-of-the-evidence argument by admitting that there were factual issues and failing to file a Rule 50 motion); *cf. United States v. Filker*, 972 F.2d 240, 241-42 (8th Cir. 1992) (holding that appeals court could examine issue of government's waiver of issue despite defendant's failure to raise it).  Having invested a substantial amount of time and effort in trying this case, the Court is not going to permit Gander Mountain to now raise an argument that was available to it before trial and that, if meritorious, would have saved the Court and parties a significant amount of time and money if it had been properly asserted.

Nos. 26, 34 (Gander Mountain's summary-judgment briefs). For that reason, Gander Mountain argued, the parties could not have intended their oral agreement to be binding.

Although Gander Mountain mentioned the vendor manual's integration clauses, ECF No. 26 at 3, 17, Gander Mountain never cited the parol-evidence rule nor contended that the Court could not consider evidence of the alleged oral agreement. To the contrary, Gander Mountain expressly argued that the "*alleged verbal commitment*, the purchase orders, Gander Mountain's vendor buying agreement previously sent to Grandoe, and the related correspondence *must all be construed together*" and that "Jeanne Hall's alleged verbal commitment . . . cannot be construed in isolation." ECF No. 26 at 14, 15 (emphasis added); *see also id.* at 17, 19-20 (arguing that construing the documents and verbal commitment together shows that the quantity of gloves was subject to issuance of purchase orders). In other words, in moving for summary judgment, Gander Mountain told the Court that it *should* consider the "alleged verbal commitment" — which, of course, is the exact opposite of telling the Court that it *cannot* consider the "alleged verbal commitment."

As noted, the Court denied Gander Mountain's summary-judgment motion, holding that whether the parties made an oral contract for $3.05 million in gloves in November 2008 was a factual question. ECF No. 40. The Court did not address the applicability of the parol-evidence rule because the parties had not raised the issue. The case then proceeded to trial.

On the eve of trial, Gander Mountain moved in limine to exclude evidence of the parties' oral contract under the parol-evidence rule. ECF No. 51. Significantly, however, Gander Mountain did not argue that the parties had an integrated written contract consisting of the vendor manual and other documents. Instead, Gander Mountain relied solely on the terms of the

RAC — that is, the "Resource Allowance Contract" — which Friedman and Hall had signed during the crucial November 14 meeting. As noted earlier, the RAC sets forth certain terms, such as payment methods, delivery terms, and marketing allowances, that would apply to any purchase agreement that Gander Mountain and Grandoe reached during the following year. It also contains an integration clause.

Gander Mountain's motion in limine — which was in reality a thinly veiled summary-judgment motion — took the Court by surprise. During the summary-judgment hearing, the Court had specifically asked Gander Mountain about the significance of the RAC. (The Court did so because Grandoe addressed the RAC in its briefing, but Gander Mountain barely mentioned it.) In response to the Court's questions, Gander Mountain assured the Court that the RAC was *irrelevant* to the parties' dispute. The Court was therefore puzzled when, months later, Gander Mountain spun on its heels and insisted that this supposedly irrelevant document was, in fact, the single most important piece of evidence in the case, as it precluded all evidence of the parties' oral contract.

To explain this complete reversal, Gander Mountain's counsel claimed that he had not read the entire RAC prior to the summary-judgment hearing. The Court finds this assertion impossible to believe. The RAC is only two pages long. It is also the only signed document that emerged from the very meeting at which the parties allegedly entered into the oral contract that is at the heart of this case. And Grandoe explicitly addressed the RAC in its summary-judgment brief — a brief to which Gander Mountain replied. It is inconceivable that Gander Mountain's extremely thorough and aggressive attorneys would not have read the RAC before the summary-judgment hearing. Moreover, Gander Mountain's lawyers were clearly familiar with the RAC

during discovery; in fact, they questioned Grandoe's witnesses about it. Again, it is not believable that Gander Mountain's attorneys neglected to read the two-page RAC before questioning Grandoe's witnesses about it.

In any event, the Court denied Gander Mountain's motion in limine. As the Court explains in more detail below, an oral agreement to purchase gloves does not contradict the RAC in the slightest for the simple reason that the RAC is not an agreement for the purchase of gloves. The RAC does not commit Gander Mountain to buy or Grandoe to sell a single glove; instead, it merely contains some of the ancillary terms that will apply *if*, in the future, Gander Mountain and Grandoe *do* reach an agreement regarding the purchase of gloves. But regardless of the merits of Gander Mountain's argument that the RAC alone precluded evidence of the parties' oral agreement, that argument was clearly different from its current argument that the vendor manual is part of an integrated contract that precludes evidence of the parties' oral agreement. Thus, at no time before trial did Gander Mountain contend that the terms of the vendor manual precluded evidence of an oral contract under the parol-evidence rule.

Nor did Gander Mountain make this argument at any time *during* the trial. After Grandoe rested, Gander Mountain made an oral motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). With respect to Grandoe's contract claim, Gander Mountain made four arguments: It argued that (1) there is insufficient evidence that Grandoe made a contractual offer; (2) there is insufficient evidence that Gander Mountain accepted any such offer; (3) by accepting the purchase orders, Grandoe agreed that Gander Mountain was under no obligation to issue any further orders; and (4) there is insufficient evidence that Jeanne Hall had authority to enter into a $3.05 million contract for the purchase of gloves. At no time during its argument did Gander

Mountain say a word about the parol-evidence rule or argue that the vendor manual rendered evidence of the parties' oral agreement inadmissible.[5]

In short, at no time did Gander Mountain argue that the vendor manual is part of an integrated written contract that bars evidence of the parties' oral agreement under the parol-evidence rule. Because Gander Mountain failed to make that argument in its Rule 50(a) motion, it cannot make it now. "By definition, a Rule 50(b) motion is a renewal of a prior Rule 50(a) motion made at the close of the evidence and as such is limited to those issues raised in the previous motion." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 794 (8th Cir. 2003); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury."); *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003) ("post-trial motion for judgment may not advance additional grounds that were not raised in the pre-verdict motion" (citation and quotations omitted)).

### b. Merits

Even if Gander Mountain's newly minted argument was properly before the Court, the Court would reject it.

At trial, the parties stipulated that the vendor manual "became part of each transaction when Gander Mountain issued purchase orders that Grandoe accepted." ECF No. 80 at 4.

---

[5]During the hearing on Gander Mountain's Rule 50(a) motion, the Court warned Gander Mountain not to argue to the jury that, as a matter of law, the vendor manual wiped out the parties' oral agreement. But this was merely a warning to Gander Mountain not to reargue its summary-judgment motion before the jury. As noted, that summary-judgment motion was not predicated on the parol-evidence rule, but instead on the argument that, by posting its vendor manual on its website, Gander Mountain forever insulated itself from being held responsible for oral commitments.

Gander Mountain issued its first purchase order in June 2009 for $9,996 worth of gloves. Pl.'s Exs. 88, 97. Therefore, Gander Mountain argues, as of the date of that first purchase order, the parties had an integrated written contract for $9,996 worth of gloves, and any evidence that Gander Mountain had orally agreed to buy $3.05 million worth of gloves is not admissible under the parol-evidence rule. *See* Minn. Stat. § 336.2-202.

Obviously, however, by stipulating that the vendor manual "became part of each transaction" when a purchase order was issued, Grandoe was not conceding that, when it accepted the first purchase order for $9,996 worth of gloves, it agreed to supersede a previous oral contract for $3.05 million worth of gloves. Putting aside the fact that it would have been utterly irrational for Grandoe to "forgive" a binding oral commitment to purchase $3.05 million worth of gloves in return for a $9,996 purchase order *that Gander Mountain was already legally obligated to issue*, it would have been utterly irrational for Grandoe's attorneys to have made the concession suggested by Gander Mountain, as such a concession would have made this entire litigation, including the trial, a pointless exercise. Indeed, if Gander Mountain thought that Grandoe had made such a concession, one wonders why Gander Mountain did not move for judgment as a matter of law on that basis before the case went to the jury.

Instead, Grandoe's concession — that the vendor manual "became part of each transaction" — should be read in light of its argument that each purchase order was a component part of the parties' overall contract. In that light, it is clear that Grandoe did not concede that, by accepting a $9,996 purchase order, it agreed to any terms in the vendor manual that would have wiped out the parties' $3.05 million oral agreement. Whether Grandoe in fact agreed to such terms, therefore, was a factual question for the jury. And the jury had ample evidence on which

to reach the reasonable conclusion that Grandoe did not throw away a $3.05 million commitment merely by accepting a $9,996 purchase order from Gander Mountain.

Whether Grandoe assented to a modification of the parties' earlier oral contract must be assessed based on its objective conduct, not its subjective, unexpressed intentions. *Holt v. Swenson*, 90 N.W.2d 724, 728-29 (Minn. 1958). In assessing Grandoe's objective conduct, however, the jury could consider the overall context of the parties' dealings. *Cf. Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992) ("In determining whether a contract was formed a court does not need to rely on words alone, but can consider the surrounding facts and circumstances in the context of the entire transaction, including the purpose, subject matter, and nature of it." (citation and quotations omitted)).

The most obvious reason why Grandoe would not have agreed to such a drastic modification of the parties' oral contract was well known to Gander Mountain. Grandoe had already manufactured millions of dollars' worth of gloves — private-label gloves that could not be sold to anyone other than Gander Mountain. Gander Mountain was also well aware of Grandoe's position that Gander Mountain had contractually agreed to purchase $3.05 million worth of gloves; by the time that Gander Mountain issued the first of the purchase orders, the parties' dispute had already arisen. Under these circumstances, the jury could easily infer that it was obvious to everyone that Grandoe did not intend to give up its rights under the oral contract merely by accepting a purchase order for a negligible quantity of gloves.

To be clear, there is no question that a purchase order can be a final, integrated written contract. *See, e.g.*, *Action Time Carpets, Inc. v. Midwest Carpet Brokers, Inc.*, 271 N.W.2d 36, 39 (Minn. 1978). Likewise, there is no doubt that a purchase order can incorporate the terms of

other documents, including online documents.[6]  *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267-68 (5th Cir. 2011).  And it is true, as Gander Mountain points out, that under the Uniform Commercial Code, parties can agree to modify their contract without additional consideration.  Minn. Stat. § 336.2-209.  But the fact that it was legally *possible* for Grandoe to agree to modify the parties' contract — or that Grandoe *could* have agreed that the vendor manual and purchase orders were the sole expression of the parties' agreement and superseded any conflicting oral agreement — does not mean that Grandoe *did* so.

The fact that the vendor manual contains integration clauses does not change the outcome.  A contractual integration clause "establishes that the parties intended the writing to be an integration of their agreement."  *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003).  But this rule arises from cases in which there is no dispute that the parties agreed to such a clause — typically because the clause appears in a document signed by both parties.  Here, however, there is no such signed document.  Instead, Gander Mountain sent a $9,996 purchase order to Grandoe knowing that Grandoe had already spent millions of dollars manufacturing gloves in reliance on the parties' earlier oral agreement.  Under these circumstances, a jury could find that Grandoe did not agree — and that Gander Mountain knew that Grandoe did not agree — that the purchase orders and vendor manual constituted the sole agreement between the parties.

---

[6]It is worth noting that there seems to be no evidence that the purchase orders in fact incorporated or even referred to the vendor manual.  Instead, the incorporation seems to be entirely from the other direction — that is, the vendor manual incorporated the purchase orders.  If that is true, then the Court would be inclined to say that this is an additional basis on which the jury could find that Grandoe's acceptance of the purchase orders did not constitute acceptance of any term in the vendor manual that would have superseded the oral agreement.  As Grandoe never made a point of this, however, the Court does not rely on it.

Nor does the parties' prior course of dealing compel a finding that Grandoe should have known that Gander Mountain did not intend to be bound by anything other than a purchase order. Eric Friedman, Grandoe's president and CEO, testified that all prior transactions between Gander Mountain and Grandoe involved an initial oral commitment from Gander Mountain based on which Grandoe would manufacture the desired product. Shortly before the shipping dates, Gander Mountain would issue purchase orders consistent with its prior oral commitment. Friedman testified that Grandoe could not possibly have met the shipping dates identified in the purchase orders if it had to wait for those purchase orders before even beginning to manufacture the product.

The jury was free to credit this testimony and find that the parties' prior course of dealing established that Gander Mountain made oral commitments in order to induce Grandoe to manufacture goods long before purchase orders were issued. Setting that aside, even if the jury credited Gander Mountain's characterization of the prior course of dealing, the jury could have found that the unique circumstances of the November 2008 contract — involving a heavily discounted private-label program contingent on the ability to begin manufacturing immediately — was sufficiently different from the parties' prior dealings such that Grandoe could justifiably conclude that Gander Mountain intended to be bound by the oral agreement notwithstanding any prior course of dealing to the contrary.

In short, whether Grandoe agreed to terms in the vendor manual that would have superseded the parties' oral agreement was a question of fact, and there was sufficient evidence from which the jury could conclude that Grandoe made no such agreement. The Court therefore denies Gander Mountain's motion for judgment as a matter of law on Grandoe's contract claim

to the extent it is based on the argument that the vendor manual was part of an integrated written contract that precludes evidence of the parties' oral agreement.

### 2. The Resource Allowance Contract ("RAC")

As part of its parol-evidence argument concerning the vendor agreement, Gander Mountain also points to the RAC. It is unclear to what extent Gander Mountain continues to argue that the RAC, by itself, precludes evidence of the parties' oral agreement. To the extent that Gander Mountain persists in this argument, however, the Court rejects it for the same reasons that it denied Gander Mountain's motion in limine.

To begin with, it is hard to understand how the RAC, standing alone, could even be called a contract. The parties agree that the RAC is not a contract for the purchase of goods; it simply contains terms that will apply *if*, sometime in the future, Gander Mountain *does* enter into a contract for the purchase of goods. By itself, therefore, the RAC does not bind anyone to do anything. *Cf. Richie Co., LLP v. Lyndon Ins. Grp., Inc.*, 316 F.3d 758, 760-61 (8th Cir. 2003) (under Minnesota law, agreements to agree are not enforceable).

Even if the RAC is a contract, however, it does not supersede or preclude the parties' oral agreement for the purchase of gloves. To the contrary, the RAC clearly contemplates that the parties will enter into separate purchase agreements; indeed, the whole *point* of the RAC is to supplement those separate agreements. And nothing in the RAC requires those separate agreements to be in writing.[7] *See W.R. Millar Co. v. UCM Corp.*, 419 N.W.2d 852, 855 (Minn.

---

[7]Gander Mountain has previously suggested that the RAC is a "clear expression of Gander Mountain's intent not to be bound by 'any terms . . . on any contract [or] order . . . unless Gander Mountain consents thereto in writing.'" ECF No. 56 at 9. Gander Mountain's selective quotation is misleading, however. The full language states that "*This Agreement*" — that is, the

(continued...)

Ct. App. 1988) ("An oral agreement is not superseded or invalidated by a subsequent integration if it is not inconsistent with the integrated contract and would naturally be made as a separate agreement.").

The RAC's integration clause reflects that it is not a complete statement of the parties' contractual relations: It states that the RAC is "the entire agreement between the parties *with respect to the subject matter of this Agreement . . . .*" Def.'s Ex. 2 (emphasis added). Obviously, the "subject matter" of the RAC is not a commitment by Gander Mountain to buy or a commitment by Grandoe to sell a particular quantity of gloves; again, the RAC does not obligate anyone to do anything. Rather, the "subject matter" of the RAC is certain ancillary terms — such as shipping, payment, rebate, and marketing terms — that will apply if, in the future, Gander Mountain and Grandoe reach a separate agreement regarding the sale of gloves.

If the parties were disputing any such ancillary terms, then the RAC's integration clause might come into play. But the parties are not disputing any such ancillary terms. Grandoe is not claiming, for example, that it should not be required to give Gander Mountain a 25 percent new-store discount. Instead, the parties' dispute centers around the quantity of gloves that Gander Mountain committed to purchase, and not one word of the RAC addresses the quantity of gloves that Gander Mountain committed to purchase. Because the RAC is not a purchase agreement, the parties' dispute over whether they entered into a purchase agreement has nothing to do with

---

[7](...continued)
RAC — "*may not be superseded by* any terms, conditions or restrictions on any contract, order, copy instructions or other matter unless Gander Mountain consents thereto in writing." (Emphasis added.) Because the parties' oral agreement for the purchase of gloves did not purport to supersede any term in the RAC, this language is irrelevant.

the RAC.  Undoubtedly, that is precisely why Gander Mountain's counsel represented at the summary-judgment hearing that the RAC was *irrelevant* to the parties' dispute.

It is true that the RAC recited the parties' estimate that Gander Mountain would later agree to purchase $1.5 million worth of accessories.  But that was nothing more than an estimate, and both Jeanne Hall and Rick McCabe (Hall's supervisor) testified that the estimate was not binding in any way.  Indeed, during one of the very few times that Gander Mountain mentioned the RAC during the summary-judgment proceedings, Gander Mountain expressly argued that the RAC "did not bind either party with respect to the quantity, price, and style of gloves Gander Mountain would purchase."  ECF No. 26 at 18 n.1.  For all of these reasons, the Court continues to reject Gander Mountain's argument that the RAC — the document that, according to Gander Mountain itself, had nothing to do with "the quantity, price, and style of gloves Gander Mountain would purchase" — somehow precluded or superseded the parties' oral agreement regarding the quantity, price, and style of gloves that Gander Mountain would purchase.

### 3.  Remaining Arguments

Gander Mountain makes several additional arguments in favor of judgment as a matter of law on Grandoe's contract claim, all of which are without merit.

First, Gander Mountain argues that, setting aside the operation of the parol-evidence rule, the parties agreed that the vendor manual and purchase orders represented their entire contract and that Gander Mountain had no further obligation to send any purchase orders after it issued the first one.  As discussed above, however, the jury was free to find that Grandoe did not, in fact, reach any such agreement with Gander Mountain.

Second, Gander Mountain argues that Grandoe knew, from its earlier dealings with Gander Mountain, that the only way Gander Mountain made any kind of binding commitment was through purchase orders. Because the parties contemplated purchase orders as part of their private-label transaction, Gander Mountain argues, Grandoe must have known and intended that there was no binding agreement until Gander Mountain issued purchase orders. As discussed earlier, however, other evidence tended to show that the parties treated a purchase order not as a prerequisite to a binding agreement, but rather as a shipping document providing logistical information in connection with an agreement that had already been reached. The jury was properly instructed that it could consider the parties' words and actions, and all of the surrounding facts and circumstances, in determining whether the parties intended to be bound only when their agreement was reduced to writing. ECF No. 80 at 6. Based on the evidence as a whole, the jury was entitled to find that the parties intended to be bound before Gander Mountain issued purchase orders.

Finally, Gander Mountain argues that there is insufficient evidence of either offer or acceptance. The Court disagrees. The evidence at trial amply supported the jury's finding that Gander Mountain orally contracted to buy $3.05 million worth of private-label gloves. Indeed, many of the crucial facts on which the jury based its verdict were undisputed. There is no doubt that, when the parties began discussing the private-label program in November 2008, Jeanne Hall knew that the early-production season was imminent and that Grandoe needed an immediate commitment. *See* Pl.'s Ex. 1 at GC00004. Hall admitted that she knew that the early-production and in-line programs were a package deal. Hall also admitted that she made a commitment of some kind to Grandoe and further admitted that she told Lee and Friedman that purchase orders

would be forthcoming.  And of course, Hall had to know that, because the gloves were to be branded with Gander Mountain's trademarks, Grandoe would not be able to sell them to anyone else.  Given this undisputed context for the parties' discussions, the jury could easily find that Hall's review and approval of the early-production spreadsheet constituted an acceptance of both the early-production and in-line programs.

The evidence of the parties' interactions over the ensuing months reinforces the inference that they had a contract for $3.05 million worth of gloves.  The parties made immediate arrangements for weekly conference calls to keep Hall up to date on Grandoe's progress. Consistent with these arrangements, Hall was given detailed updates in both calls and emails. During one of these calls, Hall confirmed the details of the in-line program.  Hall also took affirmative steps to bring the project to completion.  She advised Grandoe about obtaining access to Gander Mountain logos.  She also asked Bruce Marsh, Grandoe's independent sales representative, to prepare detailed "item set-up forms" reflecting the entire order.  The email in which Hall asked Marsh for help expressly stated that the numbers should "reflect our total unit forecast that we *committed* to."  Pl.'s Ex. 18 (emphasis added).  And Hall verbally confirmed the parties' contract, most pointedly when, during a January 2009 meeting with Lee, she gestured at the spreadsheets containing the terms of the deal and said, "Let me put your mind at ease.  We're *committed*."

In contrast to the robust evidence of the parties' oral contract, Gander Mountain's evidence that Hall never made a contractual commitment was weak.  Gander Mountain relied heavily on the notion that it had a lengthy formal evaluation process for making buying decisions and that Hall would not have short-circuited that process by making an early commitment to

Grandoe.  But Hall was well aware that (1) Grandoe needed to begin manufacturing almost immediately if Gander Mountain was to enjoy the substantial discounts provided by the early-production program and (2) the early-production program was contingent on Gander Mountain agreeing to the in-line program.  Hall could never satisfactorily explain why, if Grandoe's timeline was too accelerated, she did not simply tell Grandoe at the outset that it would be impossible for her to commit to the early-production program.  The jury could easily have concluded (as the Court did after hearing the testimony) that Hall purposely gave Grandoe every indication that she had entered into a binding contract so that Grandoe would start manufacturing gloves and Gander Mountain could take advantage of the early-production pricing — and that Hall planned to renege on her commitment and leave Grandoe holding the bag if a better deal came along or other circumstances changed.

In light of the evidence as a whole — including the need for both parties to act quickly; the fact that the parties were discussing private-label gloves not suitable for sale to other retailers; Hall's close working relationship with Grandoe over the ensuing months to facilitate the manufacturing process; Hall's oral assurance that Gander Mountain was "committed"; Hall's failure to mention the vendor manual or any other reason why she could not make an immediate commitment; and the parties' prior course of dealing, during which Gander Mountain made initial oral commitments that it honored with later purchase orders — the jury had sufficient evidence to conclude that Gander Mountain entered an oral contract to purchase $3.05 million worth of Gander Mountain-branded gloves from Grandoe.  Any difficulty in pinpointing the exact moment of either offer or acceptance is irrelevant.  *See* Minn. Stat. § 336.2-204.  The Court

therefore denies Gander Mountain's motion for judgment as a matter of law on Grandoe's contract claim.

## C. Promissory Estoppel

Gander Mountain also moves for judgment as a matter of law on Grandoe's promissory-estoppel claim. Gander Mountain makes four arguments, which the Court addresses in turn.

### 1. Existence of Contract

Gander Mountain first argues that the existence of a contract precludes recovery under promissory estoppel. *See Banbury v. Omnitrition Int'l, Inc.*, 533 N.W.2d 876, 881 (Minn. Ct. App. 1995) (promissory estoppel applies only where no contract exists). Gander Mountain did not make this argument during its Rule 50(a) motion, however. Although Gander Mountain mentioned the issue immediately before trial, it expressly noted that it was *not* making a motion at that time. The argument has therefore not been preserved. *See Andreas*, 336 F.3d at 794 ("By definition, a Rule 50(b) motion is a renewal of a prior Rule 50(a) motion made at the close of the evidence and as such is limited to those issues raised in the previous motion.").

Even if the argument had been preserved, the Court would reject it. Grandoe's promissory-estoppel claim was submitted as an *alternative* to its breach-of-contract claim. This means that promissory estoppel is relevant only if Gander Mountain is correct that the parties did not have a contract for any gloves except those covered by the purchase orders issued by Gander Mountain. If the parties contracted only for the gloves for which Gander Mountain issued purchase orders, then, by definition, the parties did *not* have a contract for the remaining gloves, and Grandoe's promissory-estoppel claim is not precluded as to those gloves.

## 2. Failure to Prove Reliance Damages

Gander Mountain next argues that Grandoe can only recover reliance-based damages, which it failed to prove. But, as the Court explained during the pretrial conference, Gander Mountain misunderstands Minnesota law. Minnesota has adopted § 90 of the Restatement (Second) of Contracts regarding promissory estoppel. *Walser v. Toyota Motor Sales, U.S.A., Inc.*, 43 F.3d 396, 400-01 (8th Cir. 1994). "As recognized by the Restatement, promises rendered binding through estoppel are entitled to the normal enforcement remedies of general contract law." *Christensen v. Mpls. Mun. Emps. Ret. Bd.*, 331 N.W.2d 740, 750 (Minn. 1983) (citing Restatement (Second) of Contracts § 90 cmt. d.). Courts have *discretion* to limit the remedy, but they are not *required* to do so. *Walser*, 43 F.3d at 401 ("This permissive language and the Minnesota courts' interpretation of it indicate to us that Minnesota courts, like the other courts addressing this issue, treat the damages decision under section 90 as being within the district court's discretion."); *see also Chester Creek Techs., Inc. v. Kessler*, No. A06-505, 2007 WL 3589, at *5 (Minn. Ct. App. Jan. 2, 2007) ("expectation damages are a permissible remedy in promissory-estoppel claims").

*Walser* supplies a useful comparison to this case. In *Walser*, the plaintiff purchased land in reliance on a promise that it would be granted an automobile dealership. *Walser*, 43 F.3d at 399-400. The Eighth Circuit held that the district court did not err in limiting the plaintiff to recovering its reliance damages, given the evidence that the dealership was far from a certainty, that the plaintiff had relied on the promise only for a few days, and that the plaintiff had failed to show that it lost any opportunities as a result of its reliance. *Id.* at 401-02.

Here, by contrast, Grandoe worked closely with Gander Mountain for months to manufacture an entire order of Gander Mountain-branded gloves to Gander Mountain's specifications. The amount of Grandoe's expectation damages is not speculative, nor will it result in a windfall to Grandoe. Under these circumstances, there is no reason for the Court to exercise its discretion to limit Grandoe to recovering only its reliance damages.

### 3. Insufficient Evidence of Promise

Gander Mountain also argues that there was insufficient evidence of a clear and definite promise. *See Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992) (promissory estoppel requires evidence of a clear and definite promise). The Court disagrees. Although neither Lee nor Friedman could remember precisely what Hall said during their November 2008 meetings, later evidence — in particular Hall's statement that Gander Mountain was "committed" while gesturing at the spreadsheets containing the details of the parties' deal, as well as Hall's February 2009 email concerning the "total unit forecast that we committed to" — demonstrates that Hall made a clear and definite promise. *See Chester Creek Techs.*, 2007 WL 3589, at *3 ("Taken separately, the individual e-mails and conversations may not have been sufficient to support the jury's verdict. However, in the aggregate, we conclude that there is sufficient evidence to support the jury's conclusion that Chester Creek made a 'clear and definite' promise . . . .").

### 4. Insufficient Evidence of Reliance

Finally, Gander Mountain contends that Grandoe's reliance was unreasonable as a matter of law. Again, however, Gander Mountain did not make this argument during its Rule 50(a)

motion, and therefore the argument is not preserved. Even if the argument were properly before the Court, the Court would reject it.

Gander Mountain primarily relies on case law holding that, where the parties' relationship is governed by a written contract, it is unreasonable for a party to rely on a contradictory oral representation. *See, e.g.*, *BankCherokee v. Insignia Dev., LLC*, 779 N.W.2d 896, 903 (Minn. Ct. App. 2010). But the written contract between Grandoe and Gander Mountain did not come into being until Gander Mountain issued a purchase order in June 2009, well *after* Grandoe had already manufactured all of the gloves in reliance on Gander Mountain's oral promises. Moreover, the same evidence that would support a jury finding that the parties had an oral contract despite the language in Grandoe's vendor manual — such as the timing and nature of the deal, and the fact that Hall worked closely with Grandoe to facilitate the manufacturing process — would also support an alternative finding that Grandoe's reliance on Hall's promise was reasonable.

The Court notes that Gander Mountain contends that reasonableness is always a question of law for the Court, citing *Faimon v. Winona State University*, 540 N.W.2d 879, 883 n.2 (Minn. Ct. App. 1995). Gander Mountain misreads *Faimon*, however. The discussion in *Faimon* concerns the final element of a promissory-estoppel claim: that the promise must be enforced to prevent an injustice. *Id.* That indeed is a legal question, and in deciding that legal question, the court will consider the reasonableness of the reliance. *Id.* But the reasonableness of the reliance is itself a question of fact for the jury. *City of Geneseo v. Utilities Plus*, 533 F.3d 608, 617 (Minn. 2008).

To the extent that Gander Mountain may be arguing that enforcement of its promise is not necessary to prevent an injustice, the Court strongly disagrees. The evidence at trial suggests that Grandoe is a relatively small company that, in reasonable reliance on Gander Mountain's promise to buy $3.05 million worth of gloves, committed significant resources to Gander Mountain's private-label program. At all times, Grandoe acted in good faith and kept Gander Mountain informed about its actions and intentions. Grandoe worked hard over a period of months to produce what appear to be high-quality gloves for Gander Mountain.

Gander Mountain, by contrast, strung Grandoe along with promises that it did not intend to keep. Despite knowing full well that Grandoe believed that Gander Mountain had promised to buy $3.05 million worth of gloves, and despite knowing full well that Grandoe was acting in reliance on that promise by investing significant resources in manufacturing gloves that only Gander Mountain could sell, Gander Mountain never said a word about its vendor manual or suggested that it was not committed to buy anything unless and until it issued purchase orders. Instead, Gander Mountain expressly told Grandoe not to worry because Gander Mountain was "committed," and Gander Mountain then worked closely with Grandoe to facilitate the process of manufacturing gloves that only Gander Mountain could sell.

Gander Mountain exploited a smaller company and then, when the smaller company complained of being exploited, Gander Mountain unleashed its lawyers to find a loophole — any loophole — through which Gander Mountain could escape. The doctrine of promissory estoppel was made to prevent injustices of precisely the type that Gander Mountain seeks to inflict on Grandoe. The Court therefore denies Gander Mountain's motion for judgment as a matter of law on Grandoe's promissory-estoppel claim.

### III.  MOTION FOR A NEW TRIAL

Gander Mountain alternatively moves for a new trial on three grounds:  (1) the verdict was against the weight of the evidence; (2) the Court erred by instructing the jury that Gander Mountain would be entitled to the gloves if Grandoe prevailed on its claims; and (3) the Court erred in admitting an email in which Hall expressed anger at her former manager.  The Court rejects all three arguments.

"A new trial is appropriate where the verdict is against the clear weight of the evidence, clearly excessive, or the result of passion or prejudice."  *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 930 (8th Cir. 2004).  When a motion for a new trial is premised on an allegedly erroneous jury instruction, "a new trial is necessary only when the errors misled the jury or had a probable effect on the jury's verdict."  *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006).  Similarly, when a motion for a new trial is premised on erroneously admitted evidence, the movant must show a clear and prejudicial abuse of discretion.  *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 864 (8th Cir. 2004).

Little need be said with respect to Gander Mountain's argument that the verdict was against the weight of the evidence.  As discussed above, there was ample evidence from which the jury could find in Grandoe's favor on both of its claims.

With respect to the alleged instructional error:  During trial, Gander Mountain objected to the Court's proposed instruction informing the jury that, if Grandoe prevailed on its claims, Gander Mountain would be entitled to the gloves.  Gander Mountain does not dispute that this was an entirely accurate statement of Minnesota law.  *See* Minn. Stat. § 336.2-709(2) ("payment of the judgment entitles the buyer to any goods not resold").  But Gander Mountain nevertheless

argues that the instruction invited a compromise verdict and therefore should not have been given.

As the Court explained during the charging conference, however, leaving the jury in the dark on this issue carried its own potential to prejudice Grandoe. The jury might assume that, if it awarded damages to Grandoe, Grandoe would get a "double" recovery — i.e., it would both get paid for the gloves and get to keep the gloves. Given that potential prejudice to Grandoe, the Court erred on the side of giving the jury a more complete and accurate statement of the law. Moreover, given the strength of Grandoe's evidence — especially on the promissory-estoppel claim — the Court is confident that the instruction did not improperly influence the jury's verdict. There is, in fact, no reason to believe that the jury reached a compromise verdict. Even if the Court erred in giving the instruction, therefore, a new trial is unwarranted.

With respect to the alleged evidentiary error: Gander Mountain argues that the Court should not have admitted a portion of plaintiff's exhibit 64, which was a December 2010 email from Hall to Rick McCabe, her supervisor. McCabe had asked Hall to comment on an email from Eric Friedman of Grandoe about the parties' dispute. *See* Pl.'s Ex. 63. Hall answered as follows:

> My so called verbal commitment was nothing more than research and exploration on possibilities/opportunities of a branded program. If I ran into Rick Rusch right now, that knife I mentioned last night would be in his neck.

Pl.'s Ex. 64.[8] Rick Rusch was Hall's supervisor until approximately December 2008, and, according to Hall, he had pressured her to work with Grandoe.

---

[8] Hall also stated that, on a scale of 1 to 10, she would rank her level of agreement with Friedman's email at 3. The Court ordered this portion of the email to be redacted.

-34-

At trial, Gander Mountain objected to admission of the last sentence, arguing that it was not probative of anything and simply made Hall look bad. The Court disagreed, holding that Hall's statements to her supervisor about the dispute were highly relevant and that the "knife" statement shed light on Hall's credibility as a witness. In particular, the "knife" statement demonstrated that, when Hall's supervisor confronted her with Friedman's version of events, she reacted with fury — fury that was directed at her former supervisor and, through him, at Grandoe. Such evidence was relevant to the jury's assessment of whether Hall's trial testimony was influenced by bias or personal ill will. On the stand, Hall had a full opportunity to explain her statement, testifying that Rusch had pressured her to work with Grandoe and that she was upset and frustrated about the problems that had developed as a result. The Court therefore does not agree that admission of this evidence was erroneous, and Gander Mountain's motion for a new trial on this ground is denied.

## IV. MOTION TO ALTER OR AMEND JUDGMENT

Grandoe moves to alter or amend the judgment to include pre- and post-judgment interest, and further asks that the Court order Gander Mountain to increase its letter of credit to cover the increased judgment amount. Although the parties originally disputed the post-judgment rate of interest, Grandoe now concedes that post-judgment interest is governed by 28 U.S.C. § 1961, ECF No. 114 at 9, and does not dispute that the applicable rate is .15 percent. *See* Stoehr Aff. Ex. A. The Court will therefore amend the judgment to reflect that Grandoe is entitled to post-judgment interest at an annual compound rate of .15 percent.

With respect to prejudgment interest, the parties dispute (1) whether prejudgment interest should be awarded at all, given that a provision in the vendor manual arguably precludes it;

(2) the date prejudgment interest began to accrue; and (3) whether prejudgment interest should be compounded. The Court addresses each dispute in turn.

## A. The Vendor Manual

In a diversity case, a prevailing party is entitled to prejudgment interest according to state law. *Capella Univ., Inc. v. Exec. Risk Specialty Ins. Co.*, 617 F.3d 1040, 1052 (8th Cir. 2010). Minnesota law allows parties to contractually limit preverdict interest. *See* Minn. Stat. § 549.09(b) (stating that preverdict interest shall be computed according to the statute "[e]xcept as otherwise provided by contract or allowed by law").[9]

Gander Mountain contends that the parties contractually agreed that Gander Mountain would not be liable for prejudgment interest. Gander Mountain relies on the following language in the vendor manual:

> In no instance shall Gander Mountain be liable to Vendor in excess of the actual Order price, less applicable discounts and/or other deductions, and no interest or other charges including, but not limited to, handling or freight charges shall be recognized or paid by Gander Mountain upon any Order or resulting invoice, whether claimed by reason of late payment, changes to the Order or otherwise.

Def.'s Ex. 1 § 4.2. As discussed above, however, the parties stipulated that the vendor manual "became part of each transaction *when Gander Mountain issued purchase orders* that Grandoe

---

[9]Section 549.09 provides for two periods of prejudgment interest: preverdict interest and interest between the date of the verdict and the date of the judgment. Although the statute allows for contractual limits on preverdict interest, it does not allow for such limits on post-verdict interest. *See Hennings v. State Farm Fire & Cas. Co.*, 438 N.W.2d 680, 686 (Minn. Ct. App. 1989) ("While State Farm cannot limit prejudgment interest *after* the verdict, it can and did preclude such interest from the commencement of the suit *to* the verdict."). Gander Mountain does not limit its argument to preverdict interest, but the Court need not address this issue further as it finds that Grandoe did not agree to waive either kind of interest (at least not with respect to the gloves that are at issue in this lawsuit).

accepted." ECF No. 80 at 4 (emphasis added). This litigation does not concern the gloves for

which Gander Mountain *did* issue purchase orders; rather, the subject of this litigation is the

gloves for which Gander Mountain did *not* issue purchase orders. As to those gloves, the vendor

manual never became part of the parties' contract. The Court therefore rejects Gander

Mountain's argument that prejudgment interest is contractually precluded.

*B. Accrual Date*

Grandoe claims that it is entitled to prejudgment interest under Minn. Stat. § 549.09 and

Minnesota common law. Aside from Gander Mountain's argument that Grandoe contractually

waived its right to interest, there is no dispute that Grandoe is entitled to prejudgment interest

under § 549.09 from the date that it filed this action. The parties dispute, however, whether

prejudgment interest started to accrue *before* Grandoe filed this action.

Under § 549.09, prejudgment interest begins to run on the earliest of "the commencement

of the action or a demand for arbitration, or the time of a written notice of claim . . . ." Minn.

Stat. § 549.09, subd. 1(b). This is true even if the damages were not liquidated or readily

ascertainable. *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 869-70 (8th Cir.

2004).

Under the common law, by contrast, no written notice of claim is required. Instead,

prejudgment interest begins to run when the claim accrues, with one important caveat: The

damages must be either liquidated or readily ascertainable. *Matthew v. Unum Life Ins. Co. of

Am.*, 639 F.3d 857, 864 (8th Cir. 2011) ("Under Minnesota common law, prejudgment interest

running from the date the claim accrued may be awarded in the case of unliquidated claims only

where the damages were readily ascertainable by computation or reference to generally

recognized standards such as market value . . . ." (citation and quotations omitted)); *Williams v. Heins, Mills & Olson, PLC*, No. A09-1757, 2010 WL 3305017, at *8 (Minn. Ct. App. Aug. 24, 2010) ("By statute, prejudgment interest is available from the time of the commencement of the action or a demand for arbitration, or the time of a written notice of claim. But under common law, prejudgment interest on an unliquidated claim that is readily ascertainable runs from the time that the claim arose." (citations and quotations omitted)).

### 1. Interest under § 549.09

Grandoe contends that statutory interest began accruing on April 16, 2009 (or, alternatively, April 24, 2009) because it gave "written notice of claim" on those dates via email.[10] The Court agrees with Gander Mountain, however, that neither of the two April 2009 emails qualifies as a "written notice of claim." "The phrase 'written notice of claim' . . . simply means a demand for payment (or other similar assertion) contained in a writing." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 845 F. Supp. 2d 975, 978 (D. Minn. 2012), *aff'd*, 703 F.3d 1104 (8th Cir. 2013); *see also Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc.*, No. 04-4699, 2008 WL 4527816, at *9 (D. Minn. Sept. 29, 2008) ("Minnesota courts have frequently described the required notice under Minn. Stat. § 549.09 as a demand for payment.").

The emails set forth Grandoe's understanding of the parties' contract as well as Grandoe's preliminary attempt to negotiate a solution to the dispute. *See* Carlson Decl., Jan. 4,

---

[10]In its reply brief, Grandoe also identifies a December 2010 email as a "written notice of claim." Grandoe did not mention this email in its opening brief, however, and the Court declines to consider it. *See Smith v. United States*, 256 Fed. Appx. 850, 852 (8th Cir. 2007) ("the district court did not err in dismissing claims raised for the first time in a . . . reply brief"); *Gearin v. City of Maplewood*, 780 F. Supp. 2d 843, 866 n.23 (D. Minn. 2011) (declining to consider argument made for the first time in reply brief).

2013 [ECF No. 90] Exs. A, B.  But neither email demands payment; instead, the emails seem to invite further discussion and negotiation.  *See Flint Hills Res. LP*, 2008 WL 4527816, at *9 (holding that a letter was not a "written notice of claim" because the letter did not demand anything, "specifically contemplate[d] future business relations," and "appear[ed] much more like a notice that Lovegreen had put a business relationship at risk than notice of a legal claim").  Grandoe is therefore not entitled to prejudgment interest under § 549.09 for the period before it filed this lawsuit.

### 2.  Interest under the Common Law

Grandoe contends, alternatively, that common-law interest began accruing on April 16, 2009 because its claims arose on that date and its damages were readily ascertainable.  Gander Mountain did not respond to this alternative basis for prejudgment interest.

Admittedly, Grandoe's briefing was not a model of clarity.  Nevertheless, Grandoe's brief was clear enough to put Gander Mountain on notice that Grandoe was making a claim under the common law for prejudgment interest.  Grandoe stated that it was seeking prejudgment interest "under Minnesota common law and Statute § 549.09(a) and (b)."  ECF No. 89 at 2.  Grandoe also asserted that its damages were ascertainable.  ECF No. 89 at 2, 5 n.5.  This could only be understood as a reference to a common-law claim, since ascertainability is irrelevant under § 549.09.  *Children's Broad. Corp.*, 357 F.3d at 869-70.

Notwithstanding Grandoe's references to a common-law claim for interest, Gander Mountain said nothing about it.  And having failed to address Grandoe's claim, Gander Mountain obviously has not disputed any of Grandoe's arguments in support of that claim.

First, Gander Mountain does not dispute Grandoe's assertion that its claims accrued on April 16, 2009, when it became clear that the parties had a dispute. It appears to the Court that Grandoe's assertion is correct. On April 15, Hall informed Lee that purchase orders were forthcoming but that some styles would be cut. Carlson Decl. Ex. A. The next day, in response to Lee's protest, Hall claimed that the "vendor agreement . . . was maxed at 1.0 [million dollars.]" *Id.* (Hall was referring to the RAC's estimated receipts of $1.5 million, which she mistakenly remembered as $1 million.) Hall's statements appear to be a repudiation of the parties' oral agreement, which would give Grandoe the right to sue for breach. *See* Minn. Stat. § 336.2-610(b) (when a party anticipatorily repudiates the contract, the aggrieved party may resort to any remedy for breach). Grandoe's claims therefore accrued that day.

Second, Gander Mountain does not dispute Grandoe's claim that its damages were readily ascertainable. Again, it appears to the Court that Grandoe is correct: All Gander Mountain had to do to determine the amount of Grandoe's claim was to consult the spreadsheets setting forth the quantities and prices of the gloves that Gander Mountain promised to purchase. *Cf. Potter v. Hartzell Propeller, Inc.*, 189 N.W.2d 499, 504 (Minn. 1971) ("The question is not whether the parties agreed on the amount of damages but whether defendant could have determined the amount of his potential liability from a generally recognized objective standard of measurement . . . .").

Finally, Gander Mountain does not dispute Grandoe's assertion that it is entitled to an interest rate of 10 percent under both the common law and § 549.09. The Court notes that the matter is not free from doubt. *Compare Nw. Airlines, Inc. v. Flight Trails*, 3 F.3d 292, 297-98 (8th Cir. 1993) (applying a rate derived from Minn. Stat. § 334.01 to a common-law claim for

prejudgment interest) *with Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 715 F.

Supp. 2d 871, 877-78 (D. Minn. 2010) (applying § 549.09 instead of § 334.01 and distinguishing

*Northwest Airlines*). But the Court is not inclined to delve into this complicated question in the

absence of any briefing from Gander Mountain. The Court therefore grants Grandoe's motion to

the extent it seeks prejudgment interest at the statutory rate of 10 percent from April 16, 2009 to

the date of judgment.

Again, the Court notes that Grandoe is indisputably entitled to prejudgment interest under

§ 549.09 from the date that it filed this lawsuit (setting aside any issue about the vendor

agreement). Therefore, even if the Court is incorrect about any aspect of Grandoe's common-law

right to interest, Grandoe should at a minimum recover interest at the statutory rate of 10 percent

from the date that it filed this lawsuit through the date of judgment.

## C. Compounding

Finally, the parties dispute whether prejudgment interest under § 549.09 should be

compounded. Neither side addresses whether interest is compounded under the common law;

instead, they both treat § 549.09 as controlling. The Court follows suit.

Gander Mountain relies on *Sphere Drake Insurance PLC v. Trisko*, 226 F.3d 951 (8th

Cir. 2000), in which the Eighth Circuit held that § 549.09 does not provide for compound

interest. *Id.* at 956-57. For its part, Grandoe cites *Fire Insurance Exchange v. Adamson Motors*,

514 N.W.2d 807 (Minn. Ct. App. 1994), which, according to Grandoe, stands for the proposition

that prejudgment interest under § 549.09 is compounded annually. Grandoe also cites *Cantor v.*

*Liebl*, No. PI 04-5847, 2005 WL 4890889 (Minn. Dist. Ct. Aug. 30, 2005), but *Cantor* simply

cites *Adamson Motors* without further analysis.

None of these authorities is particularly helpful.  To begin with, it is not clear that *Adamson Motors* actually held that interest should be compounded.  The opinion does not expressly make that point; instead, it says that "[t]he trial court correctly calculated simple interest each year and added that amount to the principal at the end of each calendar year . . . ." *Adamson Motors*, 514 N.W.2d at 810.  Although this statement seems to describe compound interest, the Minnesota Court of Appeals has rejected that reading:  "Trapp's assertion that *Fire Insurance Exchange v. Adamson Motors* used a compound interest rate is simply incorrect.  This court affirmed the district court's award of prejudgment interest based on a simple-interest calculation." *Trapp v. Hancuh*, 587 N.W.2d 61, 66 (Minn. Ct. App. 1998) (citations omitted).

Moreover, even if *Adamson Motors* did describe compound interest, the statement appears to be dicta.  The court did not cite any statutory language or other authority, nor did it undertake any kind of analysis.  It simply stated that the trial court had performed the correct calculation and then moved on to what appears to have been the real dispute — namely, the accrual date. *Adamson Motors*, 514 N.W.2d at 810.  *Adamson Motors* is therefore not particularly good evidence that § 549.09 provides for compound interest. *Cf. Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 937 (8th Cir. 2012) (federal courts sitting in diversity apply intermediate state-court decisions if they are the best evidence of state law, and may additionally take considered dicta into account).

In *Sphere Drake*, by contrast, the Eighth Circuit expressly addressed a dispute over whether interest under § 549.09 should be compounded and held that the answer is "no." *Sphere Drake*, 226 F.3d at 956-57.  *Sphere Drake* would therefore be controlling, save for the fact that the statutory language on which *Sphere Drake* relied does not apply in this case. *Sphere Drake*

relied on statutory language specifying that interest "shall be computed as simple interest per annum." *Sphere Drake*, 226 F.3d. at 957. The Eighth Circuit held that this language — and in particular the phrase "simple interest" — means that interest should not be compounded. *Id.*

Under the recently amended version of § 549.09, however, the "simple interest" language applies only to awards of $50,000 or less. Minn. Stat. § 549.09, subd. 1(c)(1). For awards over $50,000, the statute provides for an interest rate of "ten percent per year until paid," but does not otherwise specify whether interest is simple or compound. *Id.* § 549.09, subd. 1(c)(2). Because Grandoe's judgment is well in excess of $50,000, this latter provision applies and *Sphere Drake* is not controlling.

On its face, the phrase "ten percent per year until paid" does not suggest that interest should be compounded. Furthermore, it seems unlikely that the Minnesota legislature intended to provide for compound interest without expressly saying so in the statute. Nevertheless, the fact that the statute specifies that interest is "simple" for awards of $50,000 or under but does not so specify for awards over $50,000 could be taken to suggest (by negative implication) that interest for the larger awards should be compounded.

In the absence of any authority directly on point, the Court finds guidance in *Noske v. Commissioner*, Nos. 7745-R, 7746-R, 2005 WL 3543688 (Minn. Tax Ct. Dec. 19, 2005). *Noske* addressed whether interest on a refund of a tax overpayment should be compounded under Minn. Stat. § 270.76 (2004).[11] *Id.* at *2. Like the provision at issue here, § 270.76 provides for a "per annum" interest rate, but does not specify whether interest is simple or compound. The *Noske* court surveyed Minnesota statutes that provide for the recovery of interest and was unable to find

_____

[11]The statute has since been recodified as Minn. Stat. § 270C.405.

"any statute that provides for compound interest that does not specifically use the word or a derivation of the word 'compound' and provide for the period of compounding." *Id.* at *3. Given the absence of a specific reference to compounding, the court interpreted the phrase "per annum" to refer to simple interest. *Id.*

The Court agrees with the analysis in *Noske*. Because § 549.09 does not refer to compounding, and because the phrase "ten percent per year until paid" on its face describes only simple interest, the Court holds that interest on awards over $50,000 is not compounded under § 549.09. To the extent that Grandoe seeks compound prejudgment interest, therefore, its motion is denied.

In sum, the Court grants Grandoe's motion to amend the judgment to include prejudgment interest at a simple rate of 10 percent per year from April 16, 2009 through December 17, 2012, for a total prejudgment interest award of $572,389.20. This sum consists of yearly interest of $155,728.44 for calendar years 2010 and 2011 and daily interest of $426.36 multiplied by the number of days in partial years 2009 and 2012.[12] The total amended judgment is therefore $2,129,673.60. The Court orders Gander Mountain to increase its letter of credit to $2.15 million to account for the increased judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

---

[12]Following Grandoe's lead, the Court computes daily interest as yearly interest (that is, $155,728.44) divided by 365.25. There were a total of 612 days in partial years 2009 and 2012.

1.      Defendant's motion for judgment as a matter of law or, in the alternative, a new

        trial [ECF No. 96] is DENIED.

2.      Plaintiff's motion to alter or amend the judgment [ECF No. 86] is GRANTED IN

        PART and DENIED IN PART.  The December 17, 2012 judgment [ECF No. 83]

        is amended and superseded as follows:

        a.      Plaintiff shall recover $2,129,673.60 from defendant, which amount

                consists of damages in the amount of $1,557,284.40 and prejudgment

                interest in the amount of $572,389.20.

        b.      Plaintiff is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961

                at an annual compound rate of .15 percent.

3.      Defendant is ORDERED to obtain an irrevocable letter of credit in plaintiff's

        favor in the amount of $2.15 million.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: July  3 , 2013                          s/Patrick J. Schiltz_____
                                               Patrick J. Schiltz
                                               United States District Judge